Good morning, Your Honours. May it please the Court, Daniel Collins, Munger Tolles and Olsen on behalf of the Ameron Parties. I'll be splitting my time with Mr. Stern for Greenwich. He'll take five minutes and then I'll reserve five minutes for rebuttal and I'll watch my clock. For two separate and independent reasons, the District Court erred in concluding that American Home had carried its very heavy burden on summary judgment to defeat the duty to defend as a matter of law. And that heavy burden, as this Court noted in Anthem, emerges from two things. It emerges both from the procedural posture, summary judgment, and from the underlying substantive law. As this Court said in Anthem, put starkly by the California Supreme Court, was the Court's phrase, that insurers here are relieved of their duty to defend only if, quote, the complaint can by no conceivable theory raise a single issue which could bring it within the policy coverage. So the resulting standard is that if there's any view of the facts that would bring a single issue potentially within the scope of the coverage of the policy, then there is a duty to defend. And Buss says that the duty to defend extends to the entire case subject to a potential later claim for reimbursement of certain costs that were only for non-covered claims. So that's the high standard. With that in mind, I think it's clear both for a legal matter and then as a factual matter that the District Court erred. The first reason is the legal issue, that the District Court simply misconstrued the policy because the policy contains a special, what we've referred to as a knowledge endorsement. And that knowledge endorsement says that receipt of knowledge of an occurrence only counts as knowledge of the corporate named insured if the Director of Risk Management has received such notice. That, when you look at the language of the known damage exclusion, limits the scope of that exclusion. I think that's your weakest argument, actually. I don't see how that limits the scope. You know I had a fair amount of experience with insurance litigation in private practice. I just want you to explain to me exactly how that limits the scope. I'll explain that and then I'll also... I would actually go on to... I mean, the thing that I find most troublesome about this case is that as I understand the duty to defend, you're not supposed to be taking all these depositions and factoring all of that into your analysis of whether there was a potential liability as opposed to looking retrospectively at what the facts were through all this deposition testimony. That's exactly right, Your Honor, and I'll get to the factual issue. But I did want to clarify and answer Your Honor's question about the meaning of the policy before I turn to that argument. The reason why is that the known damage exclusion explicitly refers to the concept of notice. Knowledge of a claim as opposed to knowledge that there was some corrosive effect of the paint. It's knowledge of an occurrence. Right, which gives rise to a claim. Correct, or an occurrence that produces damage and then that gives rise to a claim. We litigated what an occurrence means in the best-of-insurance litigation at great length. Right, but the district court seemed to think that you couldn't have the issue of notice and coverage be linked, but the provision on its face links the two concepts together. That's the basis for our argument, that if you look at the concept to give or receive notice of an occurrence and then the knowledge endorsement limits whose notice of an occurrence counts as a receipt of that knowledge, then you have to put that together with that limitation. But let me turn to the... Can I ask you one other question? Sure. Who prepared the findings of facts and conclusions of law? The findings of fact and conclusions of law were submitted by American Home and submitted to the district court, which then I do believe made some revisions before he finalized and entered those. That's why it doesn't say that they were submitted by someone on the face of the document. It doesn't say that on the face, but I think that some modifications were made. I have not sought to redline them, but I believe that some were made by the district court before they were finalized. But the second reason, apart from the legal reason about the construction, was that even assuming that the Ameron parties had the requisite knowledge of corrosion at some of the offshore facilities, American Home did not conclusively show, for purposes of summary judgment on the duty to defend, that the Ameron parties had such knowledge as to all of the facilities. And the complaint on its face, the Sable complaint, clearly alleges damage to all aspects of the facility, both the offshore facilities and the onshore facilities and the pipelines. And the question again is whether there's any conceivable view of the facts by which a single issue could be potentially covered by the policy. And once you look at it through that lens, it's clear that the evidence was not sufficient on summary judgment to defeat the duty to defend. American Home and the district court relied on three items of evidence. The set of reports that were produced in May, from the visit in May of 2001 to the offshore, and then to the Exxon, the email about the Exxon communications in April of 2002, and McCarthy's modification to Exxon coding specifications. Let me address those in order. The reports from May 2001, American Home and the district court simply ignored the summary judgment standard here, which does not permit the drawing of inferences against the insured in this case. American Home makes arguments for why the report should be viewed in its favor and inferences should be drawn that the references there to corrosion in the offshore should be read to infer knowledge of corrosion onshore, but the documents don't say that on their face. They don't compel the drawing of that inference and the persons, the three persons who received those reports, the Brown and Root report, the McCarthy report, the Parker Brothers report, who received them all said that they didn't draw that inference, that in fact they did not have knowledge of the onshore corrosion until the late summer, early fall of 2002, when there was a separate trip to the onshore facilities. And if you look at the report, so you look at the McCarthy report, it only refers to offshore. The Parker Brothers report refers to onshore and offshore facilities as having coding breakdowns, but everyone agrees that coding breakdowns are different from corrosion. The coding breakdowns don't qualify as property damage and only the corrosion does. So the inference isn't compelled for summary judgment purposes, and indeed it's negated by direct testimony from the witnesses that they didn't have that conclusion and that has to be credited for purposes of summary judgment. Because there's a view of the factual record that leads to the conclusion that there is a potential for coverage. There was a duty to defend the whole case in summary judgment. Is the underlying litigation still going on? Yes, it is, Your Honor. The Sable case is set for trial, I'm informed, in September of 2016. So they move slowly in Canada. We don't know whether or not ultimately there's any potential for liability. This just concerns the duty to defend. This is, right now, this suit is only the duty to defend, so it's not an issue directly of indemnification in this action. Isn't the trial supposed to be before Judge Reel? I was referring to the trial and the Sable action in Nova Scotia itself is set for September of 2016. One would think that a complaint filed in Canada in 2004 might be over, but if the case is not over, it is still ongoing at this point. I just want to make sure I understand. What do you consider your best support within the policy for interpreting this continuation, change, or resumption with a geographic or physical limit? I think, frankly, if you look at all of the cases that have been cited, there isn't a single case that either side has found that says what American Home would need here, which is that the knowledge of damage to one structure can be treated as a continuation, change, or resumption of damage to a completely different structure in a different place. There's no case that says that. The one case that American Home, in its red brief, seemed to suggest did finally cross that line was Westfield. But as we pointed out in our reply brief, if you read Westfield closely on page 453 of the opinion, they make clear that their assumption in that case is that there was damage, that there was knowledge of the damage to the arches in all of the units in question. So I think then you need to bracket what the court says based on that factual assumption. Was the complaint alleged as to what was the source of the corrosion? Was it the way the paint was applied, or was it the conditions? The Sable complaint alleges both defects in the paint as well as defects in the application of the paint, and it had sued, originally the applicators were party to the suit and named in the original complaint. What's the underlying defense in the Nova Scotia? I don't know exactly what the current status of the defense is. I know what the defense is from the answer which is asserted, and the answer asserts that it's the fault of the applicators who didn't apply the paint properly, and so then, in fact, nothing is due to a product defect. So conceivably, if it was due to the application, then there would not only be a geographic component, but there would be a temporal component as well. Correct. Or conditions. If it was due to the applicators, then that would be a view of the facts under which it would clearly be a covered claim and there would be a duty to defend here. Is Westfield then your best case? You mentioned Westfield. I'm saying Westfield is sort of negatively a case. I think if you, in terms of that issue, if you look at the Obermeyer case or the VRV case, those are instances where, and the Essex case, where the courts have all indicated, and we've cited each of those in their briefs, that something continues from one to another, and the Essex case says that knowledge of damage to one structure is not continuation, change, or resumption. It doesn't count as knowledge of damage of another structure. So Essex may be our best case. And again, within the policy, what's your best support within the policy for interpreting continuation, change, or resumption with the geographic or physical limit? In terms of construing the language, I think the line that emerges from all of the cases and from the meaning of the language is that it has to flow from the damage. You can't just say that because different structures have a common cause, which factually is not even an issue because it may be due to the applicators. So there's nothing that you're pointing to within the policy that says, hey, this supports my position that continuation, change, or resumption should be looked at with a geographic or physical sort of view. I'm not saying that it's just geographical. I know that American Home says that, but that's not really, it's not just one factor. These are different structures. The geography emphasizes the fact that the structures are completely different. They don't even serve the same function. They operate in different ways. They're in different places. And it's not a continuation in the language of the policy of the cause or of the occurrence. It's a continuation, change, or resumption of the damage. And so, for example, in the Jardine case, which they rely upon, that's a continuation of damage from the rear section of the wall to the front section of the south wall. That kind of illustrates the concept of continuation, change, or resumption. It's not from one structure to another structure where there's no spread of damage or no linking in one item of damage to another item of damage. I think the cases all line up in that way, that there isn't one that jumps damage from a structure to another structure. Help me play this out then. Okay. If we agree with you that there are issues of fact about whether Ameren knew about the corrosion to the onshore facilities, then what's the procedural or the appropriate procedural posture of this case? Well, then Anthem, this Court's decision in Anthem, says what happens. Where it's clear that there is a view of the facts that would support a potential coverage, then the duty to defend is established, and summary judgment should be entered in our favor, establishing the duty to defend at that point. But I guess what's confusing me is, shouldn't the issue of knowledge go to a jury trial, or does it go to a jury trial? But it's not the issue of indemnification. It's the issue of duty to defend which is broader. And the substantive standard, it's an odd sort of thing. Help me understand it. The substantive standard says that if there's any potential view of the facts under which it is potentially covered, then the duty to defend exists, period. It exists at that point. And so summary judgment would be entered. That's what this Court did in Anthem. That's what Montrose says as well, that once you have that, normally a factual dispute would mean that there can't be summary. So does the knowledge question ever get to a jury? Not with respect to an issue of duty to defend,  of the underlying dispute whereby there's potential coverage, there's a duty to defend. So the existence of the factual issue as to the issue. So this would end? This would end. Summary judgment should be entered in our favor on duty to defend. If we were raising an issue of indemnity, then the factual issue might need to be resolved. Did you file a cross-motion for summary judgment? Yes, we did. And did you appeal that? Did you appeal that? Yes, we mentioned and requested in our opening brief, we requested, as did Greenwich, also requested that summary judgment be entered the other way, just what this Court did in Anthem. It's on all fours with Anthem in that respect. I see that. Yes, you exceeded your allocated time, so we'll give some time to Mr. Stern. He still has three minutes. No, he reserved five for Mr. Stern from Greenwich. I'm sorry. This is the Court, Max Stern for Pell and Greenwich Insurance Company, and I can confirm that we did file a cross-motion for summary judgment and stated it as the last grounds for appeal issues before the Court. I first wanted to just follow up on some of the questions the Court had also previously asked, because maybe I can add something to something that's in the Court's mind. As Judge Murguia asked, what in the policy compels this conclusion that it's a geographical limitation? And I would agree that this is an issue that hasn't really been posed in some of these cases because it's so obvious from the wording that very few people have argued that you can get this prior knowledge wording to bar coverage for separate structures that are geographically remote. Because if we look at these words, first we look at what's the knowledge. The knowledge has to be of the property damaged. That's the property damage for which coverage is sought. So first you're looking at the specific instance of property damage and figuring out if there's liability for that property damage, is that barred? And then when we look at the continuation, change, or resumption wording, those, in a sense, have to be geographic in context. That's the reason that Greenwich focused on dictionary definitions in its brief to say continuation has to have a continuity factor. It has to have an uninterrupted aspect to it. Otherwise it's not a continuation. A change is arising in a different form, and when we looked at resumption, it is to begin after interruption. Every one of these doesn't make sense at a geographically remote instance of property damage because in each place that the policy provision uses it, it uses the word the, the article the, to refer to a specific instance of property damage, or it uses the specific adjective such, such property damage, referring to the property damage earlier in the clause. So the wording is limited. It could have been broader had it been written to talk about related property damage, but it wasn't written that way. So there could have been a broader prior knowledge limitation in the policy that could have a broader effect. As Amron points out in their brief, the limitation could have applied for anything that was out of the same occurrence. That's not the wording that was used. So I think that that's where in the policy wording, the court can find the answer to this, even if it didn't have any other cases to look at. And do you agree with your colleague that if there is a, we decide there is a question of fact about whether the knowledge issue, whether Amron knew about the corrosion to the onshore facilities, then summary judgment and it's done? There's nothing that determines the knowledge? That issue is determined, and part of the reason is the case below is not a full insurance coverage case because we're in the process of the underlying case going forward. We still have a trial to await in the underlying case. So we don't know what liability is going to be imposed on Amron. That's why Greenwich came ahead and defended and it expects that American Home should have defended as well. There's uncertainty under all three of the policies as to whether there's a potential coverage on American Home. So what this court should do, we submit, is as an anthem, find there's a duty to defend on that declaratory relief cause of action. But there are additional causes of action that are called for payment in this action just in the duty to defend phase because many millions of dollars have been spent by Greenwich and it also seeks contributions. So there is a contribution damages phase still in this case to go forward once it's returned. But the answer on the declaratory judgment phase, declaring whether there's a duty to defend, that is determined by this court's finding that there's a potential for coverage. How, if at all, does the Greenwich policy differ from the American Home policy? Is it a time period issue? It's a time period issue. We have the year prior to the three American Home policies. Is this a standard policy? Most of the terms that we're talking about are all standard ISO forms. So that these are the same words as the rules that Greenwich lives by and expects American Home to live by them. We have a substantial case where there's no way that all of those structures that are alleged in that pleading, statement of claim, you could defeat the potential for coverage. And we focus, for example, in this instance because it's pretty easy to look at it, at the pipelines. Their job is to use extrinsic evidence to show prior knowledge. It has to be conclusive. That's the only way they can get there to defeat coverage so that we look at the pipelines. There's no extrinsic evidence about the pipelines. So there's no way anyone can say there is a defeating of the potential for coverage for property damage to the pipelines. No one knows about it. We don't know if it actually was damaged. That remains to be proven in the underlying case. All right. Thank you, counsel. Thank you. May it please this Honorable Court, William Corbett, Drinker, Biddle & Wreath, on behalf of the Appellee American Home Assurance Company, along with me today is my colleague, Laura Brady, also of Drinker, Biddle & Wreath. Let me apologize to the Court in advance. I've taken a bit ill and my voice isn't quite what it should be. Oh, no problem. And so if you're having difficulty hearing me, I'll try. Did you fly out here this weekend? I'll try and croak louder if the Court's having me. It's all right. Did you just come out this weekend? I did. I just came out yesterday. The Appellee respectfully submits that the District Court correctly found that the suit brought by Sable Offshore against the Amron defendants in Nova Scotia represented a single claim involving a single allegedly defective paint product supplied by Appell on Amron that caused damage to the components of a single project and that senior Amron executives were aware that such damage had begun to occur over a year before the first American Home Policy came about. So help me out here. As I understood it, they were aware of paint failure, but that doesn't create any liability. They were aware, and they've admitted it, that they were aware of corrosion damage from paint failure to the offshore facilities. And so that raises the question of whether or not the damage to the remaining portions of this project constitute a continuation, change, or resumption of the acknowledged and admitted known damage to the offshore structures. So on the basis of that information, the District Court correctly concluded that pursuant to this known damage provision that we're discussing today, there was never a potential for coverage and therefore no duty to defend on the part of American Home ever arose. The Court rejected the suggestion of Amron and Greenwich that the Sable Suit be divided into its component parts, which might require that American Home provide separate proof as to each individual component. And it quite rightly declined to apply a change to the unrelated notice condition to the question of who are the parties within Amron who must possess knowledge in order to invoke the known damage provision of the entirely separate insuring agreement. And finally, even if this Court were to favor the arguments of Greenwich and Amron today with respect to the known damage provision, it could still affirm the decision of the District Court on the basis that the conduct alleged against Amron in the statement of claim and amended statement of claim simply does not constitute an occurrence as required. Now the known damage provision for the Court's ready reference appears in the next... With respect to it, Chris, do you agree that you have to conclusively demonstrate that the Amron parties intentionally as opposed to, I guess, negligently supplied defective paint? Do you agree with that? Well, I would hearken to what this Court said in the Anthem case, and I think that even appellants have raised the Anthem case, and I think it's worth noting what was said there. The Court in Anthem at page 1055 notes that California courts have found potentially covered occurrences, quote, where the insured was negligent, and in particular, where the insured installed or supplied defective products, so long as the insured did not know it was doing so. And that's the key here, because when you look to the allegations in the statement of claim and amended statement of claim, they make it plain that Amron knew that it was supplying a paint that was inadequate to the task, that it had failed its own internal and external testing, and they knew it was failing in the field in projects similar to the Sable project. And let me ask you the same question a different way than I asked your colleagues. What's your best support within the policy for interpreting continuing change or resumption as causally based instead of... Well, I think it's well through. I can't point to a single word, Your Honor. But what I would say... The language in the policy... What I would say is this policy responds to property damage caused by an occurrence, in other words, an accident. And in this case, if we look at what the California Supreme Court did in the second Montrose case, it did two things. It held that where an event causes continuous or progressive property damage, that multiple policies can be implicated in that situation, and it also found that for purposes of the known loss defense, the common law known loss defense, an insured would have to be fully apprised of all of its potential liability. This, I think it's fair to say that this policy language, the known damage provision, was put in place post-Montrose to deal with that situation, to make it plain that where an occurrence causes damage that extends over time, only one policy will respond to it. And so I think that if the insured has knowledge that the damage has occurred or begun to occur, if it's occurred in whole or in part before the policy incepts, that the policy that follows will have no responsibility. And so all of this ties back to the concept of occurrence. Where an occurrence causes damage that extends over time, the intent of this language is to make the policy responsible, the one where the insured first acquires knowledge. And in this case, the insured had knowledge of property damage being caused by its product over a year before the American Home Policy came onto this risk. Couldn't the insurance company have done something to make this a little more clear? Well, as I said, I think this was the industry's attempt to deal with Montrose. It was an attempt to deal with the findings at the time in 1995 of progressive damage stemming from a single event, which was triggering multiple policies, which was not the industry's intent. So the intent was to try and take those continuing situations where damage progresses over time and make only a single policy you're responsible for as opposed to allowing multiple policies to be responsible. Well, I guess let me ask it a different way. You don't think that the phrase continuation change or resumption can reasonably be interpreted either way? I see nothing that allows it to be given some sort of proximity test. And in fact, not a single case that they cite does so. The best it gets for the appellants here is the New York Trial Court decision in QBE. I think when you read that decision, you see that they were construing an entirely different policy provision called the two or more policy provision. And in that case, the court found that that provision was hopelessly ambiguous. And it was in that context that the court landed upon a rule that said it dealt with a particular area of property damage, but it never sought to proclaim a proximity test and certainly gave no rationale or explanation for its reasoning. Well, what's the conclusive evidence that Ameron knew before the inception of your policy of the corrosive damage? Well, in their responses to interrogatories, and I will refer the court in the excerpts of record to page 266 and 520, Ameron admits that no later than May 2001, over a year before inception, it was aware that property damage allegedly caused by the failure of its paint product had occurred at the offshore facilities of the Sable Project. And that's not all of the evidence that's out there. I mean, we've spoken a little bit about it, and I'll speak a little more. What do we do with the... I mean, there's also evidence that I think one of Ameron's primers failed an inspection, you know, but others passed, but it passed other tests except for, you know, there was kind of, like there was notice of it failed one inspection, but it passed other tests. And I think it was Ameron BV stopped supplying the primer as soon as the test questioned the quality. Yeah, I think what's telling there, Your Honor, is what they did in response to that failed test. What they did was stop supplying the primer. They substituted a different primer and relabeled it to conceal the substitution. In fact, they retinted the substituted product so that the purchaser would not know what they were being given. Well, it seemed like the parties, there was evidence, you know, demonstrating that the parties, the Ameron party, sincerely believed that the paint was not defective and that the observed breakdowns were the result of the faulty application. Well, the fact that there may be some other party that's partially responsible for this loss doesn't change the facts of coverage with respect to Ameron. Ameron's coverage is dependent upon the liability assessed or asserted against it, not what's asserted against another party. Well, it seems like it goes to their intent because if there's other explanations, then they may not think that it's their product. And were that the case, then the occurrence defense would be of no moment in the duty defense because every insurer denies liability in the underlying case. The simple fact that it denies liability doesn't establish the potential for an occurrence. If we look at the facts alleged, not the labels attached to them because it's the facts that control, not the labels, you might label intentional conduct as negligence. It doesn't make it so. Here, if you look at the specific facts pled, and in fact Ameron BV admits these facts in its amended statement of defense, that it knew the product was failing in internal and external testing, and in response it secretly substituted a different product and concealed that substitution. There's nothing there that is accidental in nature. Under this court's ruling in Anthem, I think that the finding that there's no occurrence here is absolutely mandated. I guess the other question I have for you, I mean, I asked you about the conclusively. You're not really agreeing that you have to show conclusively, but it seems like in California we have a duty to construe exclusions narrowly against the insured. I'll raise a question first about whether this is an exclusion because it appears not in the listing of exclusions, but instead in the insuring agreement. And so my view, and my client's view, is that this known damage clause serves to describe the scope of risks underwritten. It describes the universe of claims that are within potential coverage from which then the exclusions draw. But this is not stated, it's not expressed as an exclusion. It certainly does have the effect of limiting coverage, but so does the policy territory, for example, but no one would say that that's an exclusion. We're just defining the universe of claims from which the exclusions apply. So I'm not certain that that canon of construction is even applicable in this situation, but even if it is, there is a demonstration here by conceded fact that they knew over a year before this policy came into being that damage from their one defective paint product supplied to one product was failing on that product and corrosion, potentially covered property damage, had occurred and they knew about it. And the record is replete with information showing that when the other stakeholders at Sable inspected in May of 2001, their reports, each one of them, described the fact that the paint was failing, they described the failure mechanism, they described that corrosion was resulting to the offshore platforms and said that similar breakdowns were being experienced on the onshore plants. Let me ask you, say if we do think there are issues of fact about the extent of Averant's knowledge, let me ask you what's the appropriate procedural posture. Do you agree that then summary judgment has to be granted in their favor? I don't. I don't. Because I think if you believe that the known damage provision does not bar coverage here, and if you're willing to accept their argument that the duty to defend can only be extinguished prospectively, which I think Your Honor mentioned is something of concern to her, then I think that this court can enter summary judgment for American Home on this occurrence point. Now in that situation... I just want to make sure, because you added some other things to my question, just leaving my question the way it is, and if we think that there are questions of fact about the extent of Averant's knowledge, what's the appropriate procedural posture? I assume at that point that a remand would be required. And what would happen on the remand? I suppose it would be a jury question on the state of their knowledge. And what's the authority for that? I don't have a particular authority. I understand my position is the district court got this right. No, I completely understand your position. The question is whether there's questions of fact here, I think. I know what your position is. I think you don't even get there on the knowledge because of the occurrence. I think I understand Your Honor's concern that an issue of knowledge typically presents a fact question. But I think it doesn't here because of the conceded fact. Go back in time, though, when the claim was first submitted to American Home Assurance. Because I think a lot of the evidence that you used to support your argument that you don't have a duty to defend came out during litigation of this case. And so it seems to me that you have to roll things back to where you were when you first got the claim. I think not with respect to this defense. I think the district court got it right in that respect because as was recognized by the California Supreme Court in the Scottsdale case, Scottsdale v. MV, which is a post-Montrose decision, it recognized that there are some defenses to coverage that are so fundamental to the insuring agreement, that are so fundamental to the risks that are transferred and for which a premium is paid, that a duty to defend can be said never to arise. If you look at the Monteleone case from the Court of Appeals or if you look at the L.A. Sound case from the Court of Appeals, those are cases in one involved a policy lapse and one involved a misrepresentation in application. The courts in those cases found that the defense was so fundamental to the risk insured that you could say that a duty to defend never arose. And so it matters not when the insurer discovers the facts that would enable it to assert the defense. Establishing the defense means a defense never arose. And we submit this as the same sort of thing. A loss that the insured knows about pre-policy is never insured. It's not potentially insured, it's not insured. And so it shouldn't be the case, and we think consistent with Scott's deal, the court can say it's not the case, that the defense can be extinguished only prospectively, that we can say that if that defense is established, and we submit it is on this record, the duty to defend never arose because that was never a risk that was to be transferred to the insurer by way of the policy. I understand your answer, but what do we do with the conflicting evidence regarding knowledge? Well, first of all, there's no conflict with respect to the first point that I made, and that is in May of 2001, because they've conceded knowledge of corrosion damage to the offshore platforms. That's conceded. And so if the court is willing to say that the continuation, change, or resumption language, or the in whole or in part language, means that for all damage that flows thereafter, resulting from that cause, the defective paint, there's no fact question, because the first knowledge is established. Okay, and you're relying on the knowledge provision that's in the standard insurance form issued by ISO. Yes. Did anybody submit any material from ISO explaining what that language was intended to cover? No. No, it was presented to the court as a question of, as a matter of law, on a policy provision that was argued and found by the district court to be clear and unambiguous. And in such circumstance, I think it would be inappropriate for the court to resort to extrinsic evidence. I'd also spend a moment... Let's just say we don't agree with you, and that there seems that the Ameren party's agreements are persuasive in that it seems like the knowledge, there's some question regarding the knowledge, and that perhaps it may end up being relevant that it's, you know, the continuation means geographic or with some limitations, mostly because of California law and how we have to construe these provisions. What happens? Well, I assume if the court finds that there are issues of fact pertaining to knowledge and that the continuation, change, or resumption language doesn't do it for us, then I suppose that summary judgment has to be entered in their favor because the duty to defend is extraordinarily broad in California. But here we say that the undisputed fact, the admitted fact, with respect to prior knowledge and with respect to common causation, in page 46 of the appellant's brief, Ameren itself admits that all of the damages here flow from the same cause. And so if the court is willing to find, as we argued and as Judge Real found, that the continuation, change, or resumption language is unambiguous and pertains to this situation, then there's no need for a remand, and Judge Real reached the right decision. I realize nobody argues this, but how do we know California law applies? It's a concession of the parties. It's a concession? Okay. By agreement of the parties. Okay. We'll also just spend a moment with regard to the change to the notice provision here. They've argued that, both of the appellants, I think, have argued that because the amendment to the notice condition speaks of knowledge and the known damage provision speaks of knowledge, that an amendment that was made to just a single subpart of the notice conditions should be read to apply to the known damage clause as well, effectively rewriting that provision sub silencio. We submit that that argument is incorrect for a number of reasons. First of all, the endorsement by its explicit terms modifies only condition 2A, a subpart of the notice conditions, which pertains to an insured's obligation to provide notice as soon as practicable of an occurrence. It does not apply to Parts B or C of the notice condition, and it certainly can't apply to a provision that appears in the insuring agreement in the completely separate portion of the policy. A similar argument we submit was made by an insured in the Seventh Circuit in the National Union v. Meade case, and Judge Posner there found the argument not only to be frivolous but censurable, where the insured argued that this exact same endorsement modified not just Part A of the notice condition. The insured argued it should also be deemed to modify Part B of the notice condition. Here we submit Amron goes far further. It argues that this provision should be read to apply to a completely different section of the policy, and they do so arguing the canon of construction that says that the policy should be read as a whole, but there is nothing about that canon that says that different parts of the policy, having different purposes, should be construed as having the same purpose. The notice conditions impose obligations on an insured post-policy inception to provide timely notice to its insurer of occurrences, claims, or suits. The known damage provision, in contrast, applies to the insured's pre-policy knowledge of losses and renders those losses uninsurable. We submit that it makes no sense and cannot be rationally supported that this particular endorsement can be said to modify the insuring agreement. I, speaking just for myself, personally completely agree with that part of it. The issue in contention for me has more to do with who knew when of what and how your continuing clause applies. Yeah, and I think that if the court had any lingering doubts, I would recommend to its reading from the record a document that appears in the excerpts at page 644, which was an April 2002 memorandum written by a Mr. Sneddon, who was the engineering manager at Amron B.V., which he wrote to Amron B.V. managing director Vandermeer, a man who reported to the CEO, described the paint problems they were experiencing at the Sable project to be a, quote, ongoing saga, close quote, that was sprouting arms and legs, with Exxon claiming that the paint was failing everywhere. Attached to that email, in the record, you'll find it at pages 644 to 650, a string of correspondence with Exxon's corrosion engineer, Tony Semrad, in which he sought an explanation after his March 2002 inspection of the onshore facilities why the evident paint failures at the onshore Goldboro plant were so much worse than those being seen at Point Tupper. And if you look at the inspection reports that were done by the stakeholders back in May of 2001, it is undisputed that in April those things were being circulated to senior representatives, senior executives in the form of Mr. Dickey and Mr. Vandermeer at both Amron and Amron B.V. They described a course of failure of the single paint product that was supplied to the single project and said it was failing not only in the onshore but the offshore facilities. And we submit that whatever the witnesses may have testified, those documents speak for themselves. The fact that they don't recall the documents as specifically as the documents describe the problem themselves doesn't create a fact issue. The documents are plain and unambiguous and demonstrate knowledge on the part of Amron International and Amron B.V. preceding the onset of the American Home Policy. No further questions? I'll conclude. Can I have any questions? No? All right. Thank you very much. Amron v. American Home Assurance will be... Oh. Did you... I don't know if you... You can have a minute because you've gone long today. Okay. Thank you, Your Honor. I would refer on the issue of the remedy of what the procedural posture is to page 1060 of the Anthem decision where the court says that an insurer may defeat a motion for summary judgment on the duty to defend only by producing undisputed extrinsic evidence conclusively eliminating the potential for coverage. That's defeating the cross motion for summary judgment. So that, I think, makes clear what the unusual standard is here. I would also point out... We understand that. Why don't you explain... give a response and argument as to the significance of ER 644 and the email talking about the paint failing everywhere. Yes, Your Honor. That's a reference to what I referred to earlier as the Exxon communications in April of 2002. Again, they only refer to paint failures. And again, McCarthy and Dickey and Stanley did not draw from those documents in the inference of onshore corrosion that American Home wants to draw and that in the summary judgment context cannot be drawn consistent with the summary judgment standards. I would also point out that the exclusion is construed narrowly under the Dart case. Page 1071 says it's the function in the policy and not exactly its placement. And in response to Judge McGee's question earlier, it would be the QBE and the Essex cases that would be our best cases that we've cited on the continuation change and resumption. And we've addressed the occurrence issue which the district court correctly resolved because there's obviously a way of reading the facts under which this is an occurrence and the district court correctly concluded that. If there are no further questions, I will submit. Thank you, Your Honor. I'd like to compliment both counsel. I've been under the weather at home for some months and this is the first time I've been out hearing argument. And of course I've heard Mr. Collins before, but it's a pleasure to hear him today and a pleasure to hear you. This is very well argued. And Mr. Stern as well. I think we understand all of the arguments and appreciate the quality of this argument. All right. Amaran will be submitted and this court will be adjourned.
judges: Noonan, Wardlaw, Murguia